IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

| | |
|---|---|
| RICHARD E. DICKERSON | Civil Action No.: 2:04-23258 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** |
| M/V PROLIV VILKITSKOG, *in rem* SERVRYBKHOLODFLOT d/b/a NORTHERN SERVICES GmbH, *in personam* | |
| Defendants. | |

**MAY IT PLEASE THE COURT:**

Now comes Plaintiff, Richard E. Dickerson ("Richie Dickerson"), and submits this brief in opposition to the Defendants' Motion for Summary Judgment that was filed on or about October 30, 2006.

## I. INTRODUCTION

This civil action involves serious personal injuries sustained by Richie Dickerson while he was working as a longshoreman loading boxes of frozen chicken in an ocean going vessel. Richie Dickerson was injured while climbing out of one of the ship's refrigerated hatches when a portable ladder provided by the ship's crew slipped and fell, throwing him off the ladder. According to Richie Dickerson's employer, it was the ship's responsibility to provide, maintain and secure the portable ladder.

Normally, one of the ship's crew members would hold the bottom of the ladder while Richie Dickerson and the other longshoreman climbed out of the hatch. On the day in question, the ship's

crew was not holding the ship's portable ladder. After Richie Dickerson fell, he inspected the portable ladder and noticed that the portable ladder's rubber feet, non-skid devices on the bottom of the latter, were missing. The purpose of the feet are to prevent the bottom of the ladder from slipping or moving.

Under the general maritime law, a ship and its owners and operators may be sued if they violate one of three duties owed to a longshoreman working on ths ship. These duties include the "active control duty", the "turn over duty" and the "duty to intervene". It is Richie Dickerson's position that the Defendants violated the "active control duty".[1] Under this duty, if the ship actively involves itself in the cargo operations and negligently causes an injury, or if it fails to exercise due care to intervene to protect longshoremen from hazards under its active control during the stevedoring operation, then the ship is liable to the longshoreman for his injuries. Here, the ship had active control over the subject ladder and negligently injured Richard Dickerson by not properly securing and maintaining the ladder.

Based upon the evidence provided by the Plaintiff in this brief, material issues of fact exist that preclude the Court from granting summary judgment to the Defendants.

## II. FACTS

On January 19, 2002, Richie Dickerson was employed as a longshoreman by SSA to assist with loading frozen chicken on M/V PROLIV VILKITSKOGO. See Affidavit of William Young attached as Exhibit "1". He was assigned to load boxes of the frozen chicken in M/V PROLIV

---

[1] In the event that the Court does not find that the securing of the portable ladder was under the active control of the Defendants, then the Defendants violated the duty to intervene by not stopping the longshoreman from using an unsafe ladder supplied by the ship.

VILKITSKOGO's Hatch Number 2.  Id.  M/V PROLIV VILKITSKOGO has several refrigerated hatches where the frozen chicken was loaded.  Id.

Hatch Number 2 has three decks named Number 2A-deck, Number 2 B-deck, and Number 2C-deck.  Id.  Each of the decks consist of four sides, a deck, and a ceiling.  Id.  Two of the sides are the vessel's port and starboard sides and the other two sides are the forward and aft bulkheads.  Id.  Richie Dickerson was assigned to work in Hatch Number 2 B-deck, loading boxes of frozen chicken.  Id.

The boxes of frozen chicken were first loaded in the wings of Hatch Number 2 B-deck.  Id.  The wings are the parts of Hatch Number 2 B-deck which are the nearest to M/V PROLIV VILKITSKOGO's port and starboard sides and Hatch Number 2's forward and aft bulkheads.  Id.  A ceiling is formed over the wings of Hatch Number 2 B-deck by the underside of the deck of Hatch Number 2 C-deck.  Id.  The center of Hatch Number 2 B-deck is referred to as the square of the hatch.  Id.  The square of the hatch is the space in the center of the hatch where the cargo is loaded into from shore via a crane[2].  Id.

By loading the frozen chicken in the wings of Hatch Number 2 B-deck, a ladder that was welded to the ship's bulkhead to allow longshoremen or crew to exit the hatch was blocked by the boxes of frozen chicken.  Id.  The blocking of the welded ladder by the boxes of frozen chicken prevented Richie Dickerson and the other longshoreman working in Hatch Number 2 B-deck on January 19, 2002 from using the welded ladder.  Id.

Due to the welded ladder being blocked by the boxes of chicken, the crew members of M/V

---

[2] Photographs attached as Exhibit "A" to Affidavit of William Young show the square of the hatch.

PROLIV VILKITSKOGO set up and placed a metal portable ladder into Hatch Number 2 B-deck. Id. This permitted Richie Dickerson and the other longshoreman working in Hatch Number 2 B-deck to climb out of the hatch for breaks, meals, etc. Id. The portable ladder was not owned or installed in Hatch Number 2 B-deck by SSA.[3] Id. The crew members of M/V PROLIV VILKITSKOGO were responsible for securing and maintaining the ladder in Hatch Number 2 B-deck on January 19, 2002. Id. Neither SSA nor any of its employees were responsible for maintaining or erecting the ladder. Id.

The crew members of M/V PROLIV VILKITSKOGO were also responsible for holding the bottom of the portable ladder as Richie Dickerson and the other longshoremen used the ladder to climb out of Hatch Number 2. Id. The purpose of the crew members holding the portable ladder was to prevent the ladder from falling. Id. Due to the welded ladder being blocked by the boxes of frozen chicken, use of the ship's portable ladder was the only means of Richie Dickerson's egress from Hatch Number 2 B-deck. Id.

Richie Dickerson and the other longshoreman working in Hatch Number 2 took a lunch break. See Deposition of Richie Dickerson, pp. 37, 38 and 39 attached as Exhibit "2". In order to take the lunch break, Richie Dickerson and the other longshoreman had to use the portable ladder. Id. at 37 and 41. For some unknown reason, a ship's crew member was not present in Hatch Number 2 to hold the bottom of the ladder. Id. at 36 and 37. Richie Dickerson was the last longshoreman to exit Hatch Number 2. Id. at 29 and 30. Since Richie Dickerson was the last

---

[3] A photograph attached as Exhibit "B" to the Affidavit of William Young shows a similar portable ladder erected in the square of the hatch. In the said photograph, there is no cargo blocking the welded ladder like there was on January 19, 2002.

person located in Hatch Number 2 and the ship's crew was not present, he had to climb out of the hold without anyone holding the bottom of the ladder. Id. at 29 and 30. This portable ladder was the only ladder available in Hatch Number 2 for Richie Dickerson to use to climb out of the hatch. Id. at 44 and Statement Under Penalty of Perjury of Richard E. Dickerson attached as Exhibit "3".

While he was climbing up the portable ladder to exit from Hatch Number 2, the portable ladder's feet moved, causing the portable ladder to slide out from underneath Richie Dickerson. See Deposition of Richie Dickerson, pp. 29 and 30 attached as Exhibit "2". This sudden movement of the ship's portable ladder threw him off of it. Id. at 29, 30, and 101. Richie Dickerson fell and landed on the hard deck of Hatch Number 2 B-deck. Id. and photographs attached to Affidavit of Young.

After the fall, Richie Dickerson noticed for the first time that the portable ladder was missing its rubber feet. Id. at 47. The purpose of the rubber feet is to prevent the ladder from sliding while being used. Id. at 47 and 112. Had the rubber feet been attached to the bottom of the said ladder, then the rubber feet may have prevented it from slipping and falling . Id. at 112.

As a result of the fall, Richie Dickerson sustained serious personal injuries and had to undergo six surgeries. Id. at 58, 64, 65, and 66.

### III. DISPUTED FACTS

Richie Dickerson disputes all facts claimed by the Defendants that are different from the facts listed in Section II of this Memorandum. More specifically, Richie Dickerson disputes the following facts claimed by the Defendants:

1) The portable ladder was not the ship's ladder.

2) The ship's crew had no responsibility to maintain the portable ladder.

3) The ship's crew had no responsibility to secure the portable ladder.

4) The ship's crew had no responsibility to hold the bottom of the portable ladder.

## IV. LAW AND ARGUMENT

Based upon the facts contained in the Deposition Transcript of Richard E. Dickerson, Statement Under Penalty of Perjury of Richard E. Dickeron, Statement Under Penalty of Perjury of Captain John Norcliffe (Plaintiff's liability expert)[4] and the Affidavit of William Young and the general maritime law, the Defendants are clearly not entitled to summary judgment. The facts presented by Richie Dickerson clearly demonstrate that there is a dispute as to the material facts in this matter and the Defendants as a matter of law are not entitled to summary judgement. Instead, the facts show that Richie Dickerson was injured due to the negligent conduct of the Defendants failing to provide a safe ladder, to secure the ladder, and to hold the bottom of the ladder while Richie Dickerson was attempting to climb out of the hatch using the ship's ladder. These acts demonstrate that the Defendants breached their "turn over" duty and "active control" duty, which results in them being liable to Richie Dickerson for his damages.

### A. GENERAL MARITIME LAW APPLICABLE TO CLAIMS AGAINST A VESSEL

Under the Longshore Act, Richie Dickerson is entitled to bring a 905(b) action against the subject vessel and her owner and operator. Congress, recognizing that longshore workers normally work on vessels in the course of their employment, created a statutory cause of action for negligence against vessel third parties under Section 905(b) of the Longshore Act. Section 905(b) reads: "In the event of injury to a person covered under this Act caused by the negligence of a <u>vessel</u>, then such

---

[4]Attached hereto as Exhibit 4.

person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party..." (emphasis supplied). 33 U.S.C. § 905(b). The term "vessel" under the Longshore Act is defined "said vessel's owner, owner pro hac vice, agent, operator, charter[sic] or bare boat charterer, master, officer or crew member." 33 U.S.C. § 902(21).

Congress left to the courts the task to find the applicable duty of care a vessel owes a longshoreman. See Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 1984 AMC 1817, 1821 (1994). In Scindia Steamship Navigation, Co. v. De Los Santos 451 U.S. 156, 1981 AMC 601 (1981), the Supreme Court considered the duty of care that a vessel owner owed to injured longshoreman . The Court stated the vessel's residual duties:

> The first, which courts have come to call the "*turnover*," relates to the condition of the ship upon the commencement of stevedoring operations....the second duty, applicable once stevedoring operations have begun, provides that a ship owner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "*active of control of the vessel*."...the third duty: the "*duty to intervene*," concerns the vessel's obligations with regard to cargo operations in areas under the principle control of the independent stevedore.

Howlett, 1984 AMC at 1821 (citations omitted and emphasis added).

### B. THE "ACTIVE CONTROL" DUTY

The Defendants are liable to Richie Dickerson due to their breach of the active control duty. A vessel and its owners and operators will be found liable for a longshoreman's injury, "after the stevedoring work has begun, if it actively involves itself in the cargo operations and negligently causes an injury, or if it fails to exercise due care to intervene to protect longshoremen from hazards under the active control of the vessel during the stevedoring operation." Hodges v. Evisea Maritime Co., S.A., 801 F.2d 678, 683 (4th Cir. 1986), cert. denied, 480 U.S. 933 (1987); Scindia, 451 U.S.

at 167. "The active operations duty applies to those areas under the vessel's active control, even if the stevedore shares control with the vessel or if at some earlier time the area was under the stevedore's exclusive control." Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 537 (3rd Cir. 1994). This duty incorporates general principles of land-based negligence law. Hodges, 801 F.2d at 684; see Scindia, 451 U.S. at 165 n. 13, 167.

To establish a prima facie case of breach of the operations duty, a plaintiff must show:

> (1) that the vessel appreciated, should have appreciated, or with the exercise of reasonable care would have appreciated, the condition; (2) that the vessel knew, or should have known, that the condition posed an unreasonable risk of harm to a longshore worker; (3) that a longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of the harm, or (ii) protect himself or herself from the danger; and (4) that the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition.

Serbin v. Bora Corp., Ltd., 96 F.3d 66 (3rd Cir. 1996).

Hodges involved a longshoreman's claim for injuries against a shipowner for negligence when he fell through an open hatch during loading operations. As to whether the testimony at trial supported a claim for breach of the "active control" duty, the Fourth Circuit found:

> Although the holds had been turned over to the stevedore, the ship's crew knew that loading in the No. 3 hold was complete, and had closed the weather deck hatch. There was testimony that it was the duty of the vessel to see to the closing of the hatches, and further testimony that the hatch in No. 3 was left open for the convenience of the ship. The stevedore disclaimed knowledge of how to control the lights in No. 3, and there was evidence that the crew had earlier turned the lights off. This testimony, considered in the light most favorable to Hodges, created a permissible inference that the vessel was in sufficient control of the No. 3 hold to give rise to a duty under *Scindia*.

Hodges, 801 F.2d at 683.

When reliable testimony shows a vessel's crew had a duty to perform a specific function on board the vessel in the area where a longshoreman is working, such as turning off a light and closing a hatch, this is sufficient to support a claim for vessel negligence under the active control duty.

In Serbin, 96 F.3d 66, a longshoreman was injured when a block used to move a vessel's hatch cover snapped, causing him to be injured. The longshoreman presented evidence, which the ship owner denied, that the block and hatch were within the shipowner's active control, because it was the ship's crew's responsibility to use the block to open and shut the vessel's hatch. In other words, according to the longshoremen, the task of moving the block fell to the crew.

In reversing a summary judgment, the Court of Appeals reasoned that the longshoreman presented evidence that the block was obstructed in such a manner that it could not be rotated and the jury could conclude that the shipowner -by way of the vessel's crew- knew or should have known that the block was stuck. Id. at 71. The stuck block presented an unreasonable risk of harm as it could conceivably have injured someone in any number of ways and hence, a fact-finder could reasonably conclude that the crew should have recognized the general danger the stuck block posed even if it could not conceive of the exact manner in which the longshoreman was injured. Id. at 73. With regard to the third factor, the Court found that the longshoreman foreseeably failed to (i) either discover the condition or apprehend the gravity and probability of the harm, or (ii) protect himself or herself from the danger, because he testified he did not know that the block was obstructed and would have no reason to take steps to protect himself against it. Id. at 73. The court found that ship

"failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition and could not rely upon a longshoreman to fix the problem. Id. at 77.

Another case found a shipowner was actively engaged in cargo operations, by being responsible for securing lines between the ship and shore. See England v. Reinauer Transp. Companies, L.P., 194 F.3d 265 (1st Cir. 1999)(evidence that tug owner retained control over barge mooring lines during unloading of a barge, and thus had active control duty to inspect and adjust them, was for jury).

The case of Mesa v. Chilean Line, Inc., 1998 WL 241548 (E.D.La. 1998), supports the Plaintiff's position as well. In Mesa, a claim was brought against a vessel owner for injuries that occurred to a vessel repairer while he was using an aluminum ladder provided by the vessel, which is attached as Exhibit "5". The plaintiff claimed that the aluminum ladder's defective condition caused the accident that injured him and that the ladder was missing two rungs, was bent at the top and did not have rubber skid pads on its feet. The plaintiff also asserted that when he attempted to ascend the ladder, no one was present to assist him in climbing it. He further maintained that he was required to use the defective ladder since it was the only available method of boarding the vessel.

In denying the vessel's motion for summary judgement, the court found that the vessel owner may be found liable to the plaintiff for providing a defective ladder and that the plaintiff's only alternative was to use the defective ladder. "A vessel owner remains liable if a longshoreman's only alternatives to the open and obvious hazard are unduly impracticable or time-consuming." Id. at *4. Here, Richie Dickerson had no other reasonable alternative than to use the portable ladder to exit the hatch. Since Richie Dickerson, unlike the plaintiff in Mesa, was not aware of the ladder's defective

condition, the ladder was not an open and obvious hazard. If a vessel owner can be liable for an open and obvious hazard like in Mesa, then the Defendants are liable to Richie Dickerson when the defective ladder, or hazard, is not obvious.

The above cited cases are similar to the situation in the case at bar with regard to the ship's involvement in cargo loading operations.

**C.    DEFENDANTS VIOLATED THE ACTIVE CONTROL DUTY**

The Defendants' liability in this case arises from their failure to exercise due care with regard to hazards in an area under their control. The vessel and its crew were responsible for providing and securing the ladder for the longshoremen to use to climb out of the subject hold. Thus, Defendants had active control over the portable ladder that fell, causing Richie Dickerson to be injured. The Defendants are negligent, because the ladder should have been properly maintained and secured by the ships' crew and it was entirely foreseeable that someone could fall while using the improperly maintained and secured ladder. Had the ladder been properly secured and maintained, the ladder would not have slipped out from underneath Richie Dickerson, causing him to fall.

*1. Knowledge*

The first factor Richie Dickerson must establish is whether the vessel appreciated, should have appreciated, or with the exercise of reasonable care would have appreciated, the unsafe condition. In this case, Richie Dickerson asserts that the "condition" at issue was that the portable ladder was not properly maintained (no rubber feet) and secured in such a manner that it could fall. This is sufficient evidence from which a the trier of fact could conclude that the shipowner- by way of the vessel's crew- knew or should have known that the ladder was missing its feet and was not

properly secured. As discussed above, there is evidence that the task of providing the ladder, securing it, and holding it down at the bottom as the longshoremen climbed out of the hold fell to the crew. Thus, this Court could find that the crew, in the normal exercise of their duties, should have discovered that the ladder was missing the feet and/or not properly secured.

*2. Unreasonable risk of harm*

The second issue is whether Richie Dickerson presented evidence that could establish that the vessel knew, or should have known, that the condition posed an unreasonable risk of harm to a longshore worker. The Statement Under Penalty of Perjury of Captain John Norcliffe demonstrates that it was unsafe for the ship to allow a ladder to be used without rubber feet and to not properly secure the ladder. Captain John Norcliffe further indicates that given the nature of the work being performed, using a ladder in a slippery, refrigerated hold, should have placed the ship on notice that it was imperative to properly maintain and secure the ladder. Richie Dickerson has submitted evidence showing that the portable ladder was in disrepair due to the missing feet and that it was not properly secured. This Court is entitled to draw from that evidence the reasonable inference that the ladder presented a generally hazardous condition. Richie Dickerson can rely on his evidence about this particular portable ladder and the fact-finder's reasonable inference that it was a general hazard.

It was not necessary for the crew to anticipate that a longshore worker would attempt to climb out of the hold without someone holding the bottom of the ladder and the ladder falling. An unsecured ladder with missing feet could conceivably have injured someone in any number of ways. For instance, to name just a few of the scenarios that could have occurred in Mr. Dickerson's

situation alone, the ladder could have (1) suddenly dislodged and sent him sprawling to the deck while climbing down the ladder, causing serious injury; (2) falling and landing on longshoreman working in the hold; or (3) sliding to one side or the other while Richie Dickerson was using it, resulting in him losing his balance and falling off the ladder. Thus, recognizing that the portable ladder with the missing feet presented a general hazard would not require clairvoyance on the part of the crew that a longshoreman would hurt himself in this particular way. A fact-finder could reasonably conclude that the crew should have recognized the general danger the portable ladder posed.

### 3. Foreseeable failure of longshoreman to protect against harm

Richie Dickerson has introduced evidence that supports a ruling that a longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of the harm, or (ii) protect himself from the danger. It should have been obvious to the vessel's crew that the unsecured portable ladder with missing feet presented an obvious danger under these circumstances. In addition, as indicated by William Young, the stevedore, the ladder welded to the ship was blocked by the boxes of frozen chicken, cutting off Richie Dickerson's access to the ladder. Since Richie Dickerson could not use the welded ladder, he had to use the portable ladder to exit the hold. Accordingly, his use of the portable ladder was unavoidable. It is not reasonable for a shipowner to expect a longshoreman to avoid the hazzard of using the portable ladder. See Serbin, 96 F.3d at 73.

Second, the record in this case does not establish that Richie Dickerson knew the portable ladder was missing its feet and dangerous. Instead, Richie Dickerson testified that he did not know

-13-

the ladder was missing its feet and relied upon the ship's crew to properly secure the ladder. The Court can conclude that Richie Dickerson was reasonable in his assumption. If Richie Dickerson reasonably did not apprehend the unsafe condition of the portable ladder, he also would have no reason to take steps to protect himself against it. A disputed issue of material fact, therefore, precludes summary judgment on this issue.

*4. Reasonable steps to avoid harm*

The final issue is whether the ship failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition. The ship failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition. Since the ladder was missing its feet, not properly secured and not being held down at the bottom while Richie Dickerson was climbing out of the hold by the crew, the ship did not take steps to prevent or eliminate the dangerous condition of the portable ladder falling. The record does not demonstrate that vessel had an established a "mechanism" for dealing with fixing or securing the portable ladder.

Second, the Defendants will not even admit that the ship had portable ladders and that it was the ship's crew's responsibility to secure the ladder. If the ship will not even admit these facts, then the ship cannot demonstrate that it took reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition of the improperly secured the portable ladder. The proper steps for the ship to take to avoid the danger would have been to fix the ladder, to make sure that the ladder was properly tied off at the top so it would not fall and to have someone holding the bottom of the ladder while the longshoremen were climbing out of the hold.

## IV.  CONCLUSION

Richie Dickerson has submitted admissible evidence that the subject portable ladder was provided by the ship, that the ship's crew was responsible for securing it, that the ship's crew failed to properly maintain and secure it, and that he was injured as a result of the crew's failure to properly secure and maintain the ladder.  These facts, if accepted as true by the Court, results in the Defendants being liable to Richie Dickerson for their violation of the "active control" duty.  Thus, a material question of fact exists as to who owned the ladder and was responsible for maintaining and securing it.  As a matter of law, this prevents the Defendants from being granted summary judgement.

BLUESTEIN LAW FIRM, P.A.

By: s/S. Scott Bluestein
 S. Scott Bluestein / Federal ID No. 6981
1040 eWall Street
Mount Pleasant, SC 29464
P.O. Box 2253
Charleston, SC 29413
(843) 577-3092
	- and -
Malcolm M. Crosland, Jr. /Federal ID No.  4180
The Steinberg Law Firm
111 Church Street
Charleston, SC 29402
(843) 720-2800
ATTORNEYS FOR PLAINTIFF

December 1, 2006
Mount Pleasant, South Carolina